[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a petition for a writ of habeus corpus by a prisoner claiming: (1) The retroactive application of Connecticut General Statutes section 18-100 (b), as amended by Public Act 89-383 section 13, is in violation of the constitutional prohibition against ex post facto laws, and (2) the retroactive application of the Commissioner of Corrections' regulation as stated in his directive of June 27, 1989 is in violation of the constitutional prohibition against ex post facto laws.
The court finds the following facts regarding the petitioner's claims.
The petitioner, Robin Schildge (hereinafter referred to as "petitioner") is presently serving 3 concurrent 8 year sentences, suspended after 5 years, probation for 3 years with CT Page 6298 special conditions as set forth on the mittimuses.
The petitioner was convicted on 3 counts of sales of narcotics by a non-drug dependent person in violation of Connecticut General Statutes section 21a-278 (b) as follows:
 a. Docket No. CR9-100033-JD Date of Sentence — April 7, 1989 1st Count — Sale of Narcotics by a non-drug dependent person in violation of Connecticut General Statutes section 21a-278 (b). SENTENCE — 8 years, execution suspended after 5 years, probation for 3 years with special conditions as set forth on the mittimus attached hereto.
 b. Docket No. Cr9-100724-JD Date of Sentence — April 7, 1989 1st Count — Sale of Narcotics by a non-drug dependent person in violation of Connecticut General Statutes section 21a-278 (b). SENTENCE — 8 years, execution suspended after 5 years, probation for 3 years with special conditions as set forth on the mittimus in CR9-100033-JD. 2nd Count — Sale of Narcotics by a non-drug dependent person in violation of Connecticut General Statutes section 21a-278 (b). SENTENCE — 8 years, execution suspended after 5 years, probation for 3 years with special conditions as set forth on the mittimus in CR9-100033-JD. TOTAL EFFECTIVE SENTENCE — 5 year minimum mandatory sentence pursuant to Connecticut General Statutes section 21a-278 (b).
The petitioner's 5 year sentence is a 5 year mandatory minimum sentence pursuant to Connecticut General Statutes section 21a-278 (b).
The offenses for which the petitioner was convicted were committed on July 12, 1988 and October 14, 1988.
The petitioner is presently confined at the Connecticut Correctional Institution at Niantic (CCIN), the state's only correctional institution for female offenders. CT Page 6299
The Connecticut Department of Correction (DOC), at the time of trial, operated 22 correctional facilities.
Larry Meachum is the Commissioner of the DOC, (hereinafter referred to as "Commissioner") and the named respondent in this action.
At the time of trial, there were approximately 17,000 prisoners in the Commissioner's custody.
These prisoners are confined in a wide variety of correctional facilities and are classified within a range of levels of security throughout DOC.
The most restrictive conditions of confinement for males is at CCI-Somers, and for females at CCI-Niantic, in the administrative segregation facilities which handle the most problematic inmates in the system, i.e. inmates who pose security risks, escape risks, demonstrate disruptive behavior or are very dangerous to other inmates and/or staff.
Medium security levels are designed for those people who generally respond to external controls and are not disruptive within the prison environment. Minimum security levels are for, those offenders who will not escape or cause disruption and can exercise internal controls as opposed to needing external controls.
CCIN incorporates within one facility services and programs for maximum, medium and minimum security offenders.
DOC has community placements and programs which include halfway houses, community residential drug treatment programs as well as work release programs.
The lowest level of security confinement for inmates in the Commissioner's custody is the community placement for supervised home release.
Supervised home release is one of the classification levels, the lowest level or level one, for offenders who are under supervision by the DOC.
Inmates classified to supervised home release are considered incarcerated inmates whose location of confinement is an approved community residence.
The phrase "approved community residence" as stated in Connecticut General Statutes section 18-100 (e) authorized the program that is known as supervised home release. CT Page 6300
Inmates classified to supervised home release remain in the custody of the Commissioner and are subject at any time to reclassification and transfer to a correctional institution.
The DOC informs inmates that there are no legitimate expectations that an inmate may be classified to supervised home release.
Inmates who wish to apply for supervised home release are expressedly notified that they have no expectation of being approved for supervised home release, or having been so classified that they may be reclassified at any time to any higher security level of confinement, including confinement in a correctional facility at the discretion of the Commissioner of Correction or his designees.
Inmates classified to supervised home release may be reclassified to any higher security level, even for circumstances over which the inmate has no control. The Community Release Application and Conditions of Community Release both state, in part, that:
 1. I agree that transfer to community release is at the discretion of the Commissioner of Correction or designee.
 2. I agree that my transfer to community release is based upon the conclusion of the Commissioner of Correction that there is a reasonable probability that I will reside on community release without violating the law and that my transfer is not incompatible with the welfare of society. If for any reason, even for circumstances over which I have no control, this conclusion becomes no longer valid then my transfer to community release will be revoked or modified accordingly.
 3. I agree that after transfer to community release, I am still an inmate and such transfer may be modified or revoked at any time at the discretion of the Commissioner of Correction or designee.
 4. I agree at any time I may be classified to any higher security level of confinement including confinement in a correctional facility at the discretion of the CT Page 6301 Commissioner of Correction or designee.
 5. I agree the following conditions must be obeyed and even if I obey these conditions, I understand that I am not entitled to stay on community release and can have no expectation of staying on community release.
The DOC establishes basic policies and procedures which serve as guidelines for administrators to classify inmates for various levels of assignment, from maximum security, administrative segregation, to level one and community placement on supervised home release.
These classification decisions utilize both objective and subjective criteria and utilize the discretion and years of correctional experience and judgment of prison administrators. Classification decisions for supervised home release do not depend on numerical, objective scores but rather turn on a whole host of subjective factors concerning the predictability of the inmate's behavior.
Decisions concerning an inmate's classification assignment consider the needs of the offender, the needs of the facility, the needs of the system, the needs of the community, the needs of the criminal justice system and the need to maintain public confidence in the criminal justice system.
At the time of trial there were approximately 5,700 inmates classified to supervised home release, with the number of inmates in this classification level ranging between 5,500 — 6,000 over the 12 month period prior to trial.
From 1985-1988 Connecticut's prison population more than doubled from approximately 8,000 to 17,000 offenders.
Section 18-87f sets forth the statutory criteria to be followed in the event of prison overcrowding emergency.
The increase in prison population is largely due to the increase in drug-related crimes resulting in approximately 80 percent of all offenders having drug-connected problems in one way or another.
About 27 percent of all offenders are serving sentences for sales or use of drugs, of which a portion is sales of drugs by non-dependent persons.
The dates of the crimes for which the petitioner was CT Page 6302 sentenced were July 12, 1988 and October 14, 1988. After the dates of the commission of the crimes, Public Act 89-383 was enacted by the legislature. Effective July 5, 1989, P.A. 89-383 barred prisoners serving sentences for violations of C.G.S.21a-278 (b) and prisoners serving sentences for crimes which carried mandatory minimum sentences from eligibility for supervised home release. The petitioner was informed that she could not apply for supervised home release as her application would not be considered or accepted as a result of being ineligible for supervised home release due to public act 89-383 and the Commissioner's policy that disqualifies inmates convicted of sales of drugs by non-drug dependent persons.
The Commissioner's policy which disqualifies inmates convicted of sales of drugs by non-drug dependent persons was implemented on June 27, 1989 prior to the enactment of P.A. 89-383.
The Commissioner would continue to implement this policy, even in the absence of a statute, because, based on his 25 years of correctional experience and the recommendations of DOC staff and other members of the law enforcement community, such a policy promotes public safety and protects the community as much as possible.
Correctional policies regarding classification of inmates, including policies concerning supervised home release, are modified from time to time based on the DOC's experience over the years as to which cases pose the greatest public threat.
Correctional policies and procedures are updated and modified based on changed correctional knowledge and theory, available resources and objective data concerning the criminal justice system and public safety.
Inmates transferred to supervised home release do not serve less time on their sentences, which remain unaffected, neither lengthened nor shortened, whether the location of confinement is in an institution or in the community.
Transfer to an approved community residence is an extension of institutional confinement and is still a place of confinement, although the inmate is no longer in an institution.
Supervised home release is not parole and inmates on supervised home release, unlike parolees, may be reclassified to any higher security levels including confinement in an institution, in the discretion of the Commissioner even in the absence of individual misconduct. CT Page 6303
Inmates on supervised home release are still inmates, and if they violate DOC rules are subject to disciplinary proceedings and possible loss of good time credits.
Inmates who are transferred from supervised home release to institutional confinement are afforded disciplinary hearings or classification hearings, by DOC, unlike parolees who are provided hearings by the Board of Parole in accordance with Morrissey v. Brewer, 408 U.S. 490, 92 S.Ct. 2593, 33 L.Ed.2d 484
(1972).
Parole does not affect an inmate's eligibility to earn good conduct credits pursuant to Connecticut General Statutes section 18-7 or section 18-7a as the case may be.
Inmates on parole who abscond have not committed a new crime, but inmates on supervised home release who abscond have committed a new crime, the crime of escape, just as if they had escaped from institutional confinement, e.g. escape from CCI, Somers or CCI-Niantic.
Inmates on supervised home release who violate conditions of their program may or may not be subject to formal discipline and are not automatically transferred to institutional confinement.
Inmates who are transferred back to higher security for classification reasons are not being punished, and do not, by virtue of their transfer to institutional confinement, serve longer sentences or in any way have their punishment increased.
Even if there were no pro se restrictions based on the policy and the statute, inmates convicted of Connecticut General Statutes section 21a-278b, can still be disapproved for transfer to supervised home release in the Commissioner's unfettered discretion, by virtue of their crime or for any legitimate reason whatsoever. II
THE PETITIONER'S CLAIM THAT THE RETROACTIVE APPLICATION OF CONNECTICUT GENERAL STATUTE SECTION 18-100 (b), AS AMENDED BY PUBLIC ACT 89-383 SECTION 13, IS IN VIOLATION OF THE CONSTITUTIONAL PROHIBITION AGAINST EX POST FACTO LAWS.
Article 1 section 10 of the Constitution of the United States provides in part as follows:
No state shall . . . pass any . . . ex post facto law. . . CT Page 6304
Weaver v. Graham, 450 U.S. 24, 67 L.Ed.2d 17,101 S.Ct. 960 (1981), involved an ex post facto claim. The issue involved in Weaver was whether a Florida statute altering the availability of "gain time for good conduct" was unconstitutional as an ex post facto law when applied to the petitioner whose crime was committed before the statute's enactment. In holding that the statute violated the ex post facto prohibition the Weaver court stated in part as follows:
 The ex post facto prohibition forbids the Congress and the States to enact any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."
 Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. . . The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation.
 In accord with these purposes, our decisions prescribe that two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to event occurring before its enactment, and it must disadvantage the offender. . .a law need not impair a "vested right" to violate the ex post facto prohibition. Evaluating whether a right has vested is important for claims under the Contracts or Due Process Clause, which solely protect pre-existing entitlements . . . . the presence or absence of an affirmative, enforceable right is not relevant, however, to the ex post facto prohibition, which forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions CT Page 6305 accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense. . . . First, we need not determine whether the prospect of the gain time was in some technical sense part of the sentence to conclude that it in fact is one determinant of petitioner's prison term — and that his effective sentence is altered once this determinant is changed. (Elimination of parole eligibility held an ex post facto violation) We have previously recognized that a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed. Second, we have held that a statute may be retrospective even if it alters punitive conditions outside the sentence. Thus, we have concluded that a statute requiring solitary confinement prior to execution is ex post facto when applied to someone who committed a capital offense prior to its enactment, but not when applied only prospectively.
 Whether a retrospective state criminal statute ameliorates or worsens conditions imposed by its predecessor is a federal question. . . . The inquiry looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual. (emphasis provided)
In Miller v. Florida, 482 U.S. 423, 96 L.Ed.2d 351,107 S.Ct. 2446 (1987) the issue of ex post facto was again raised.
At the time petitioner committed the crime for which he was convicted, Florida's sentencing guidelines would have resulted in a presumptive sentence of 3 1/2 to 4 1/2 years' imprisonment. At the time petitioner was sentenced, the revised guidelines called for a presumptive sentence of 5 1/2 to 7 years in prison. The trial court applied the guidelines in effect at the time of sentencing and imposed a 7-year sentence. The question presented is whether application of these amended guidelines in petitioner's case is unconstitutional by virtue of the Ex Post Facto Clause. CT Page 6306
The Miller court stated part as follows:
 Thus, almost from the outset, we have recognized that central to the ex post facto prohibition is a concern for "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Weaver, 450 U.S., at 30, 67 L.Ed.2d 17, 101 S.Ct. 960.
 Our test for determining whether a criminal law is ex post facto derives from these principles. As was stated in Weaver, to fall within the ex post facto prohibition, two critical elements must be present: first, the law "must be retrospective, that is, it must apply to events occurring before its enactment", and second, "it must disadvantage the offender affected by it.". . . No ex post facto violation occurs if a change does not alter "substantial personal rights," but merely changes "modes of procedure which do not affect matters of substance."
 A law is retrospective if it "changes the legal consequence of acts completed before its effective date."
 Finally, even if a law operates to the defendant's detriment, the ex post facto prohibition does not restrict "legislative control of remedies and modes of procedure which do not affect matters of substance." Dobbert, 432 U.S., at 293, 53 L.Ed.2d 344, 97 S.Ct. 2290. Hence, no ex post facto violation occurs if the change in the law is merely procedural and does "not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt." (emphasis provided)
The issue of an ex post facto law was again raised in Collins v. Youngblood, 497 U.S. -, 111 L.Ed.2d 30, 111
S.Ct. — (1990). The issue involved in Collins was whether the application of a Texas statute, which was passed after the respondent's crime and which allowed the reformation of an CT Page 6307 improper jury verdict in respondent's case, violated the Ex Post Facto Clause of Article 1 section 10. In holding that the statute in question did not violate the ex post facto clause the Collins court stated in part as follows:
 Although the Latin phrase "ex post facto" literally encompasses any law passed "after the fact", it has long been recognized by this Court that the Constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them . . . So well accepted were these principles that the Court in Beazell v. Ohio, 269 U.S. 167, 70 LEd 216, 46 S.Ct. 68 (1925), was able to confidently summarize the meaning of the Clause as follows:
 "It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto." Id., at 169-170, 70 LEd 216, 46 S.Ct. 68. . . .
Applying the principles of law of Weaver, Miller, and Collins, to this case, it is clear that the first and third types of law referred to in Collins are not involved in this case, namely the statute in question does not punish as a crime an act previously committed which was innocent when done nor does the statute in question deprive one charged with crime of any defense available according to law at the time when the act was committed. The issue before the court is whether the act in question makes more burdensome the punishment for a crime after its commission. In order for the statute to fall within the ex post facto prohibition, it must both be retrospective and it must disadvantage the offender affected by it. A statute is considered to be retrospective when it applies to events occurring before its inactment. In this case the statute does apply to events that occurred before its enactment, namely the commission of the crimes in question by the petitioner. Therefore, this court holds that the statute is retrospective.
The second requirement for an act to violate the ex CT Page 6308 post facto prohibition is that it must disadvantage the offender affected by it. The statute in question does not increase the punishment for which the petitioner is eligible as a result of its conviction. It does not make more burdensome the punishment for a crime. It merely affects where the petitioner may not be placed in serving his sentence. The so called supervised home release program statute specifically provides that:
 "Any inmate so transferred shall remain under the jurisdiction of said commissioner. Any inmate transferred to an approved community residence shall also be subject to specifically prescribed supervision by personnel of the Department of Correction until his definite or indeterminate sentence is completed."
An inmate who is in supervised home release remains in the custody and control of the Commissioner. This court therefore concludes that the statute in question does not disadvantage the petitioner and therefore does not violate the ex post facto prohibition.
 III
THE PETITIONER'S CLAIM THAT THE RETROACTIVE APPLICATION OF THE COMMISSIONER OF CORRECTIONS' REGULATION AS STATED IN HIS DIRECTIVE OF JUNE 27, 1989 IS IN VIOLATION OF THE CONSTITUTION PROHIBITION AGAINST EX POST FACTO LAWS.
The threshold issue is whether a regulation adopted by the Commissioner falls within the prohibition of a "statute which makes more burdensome the punishment for a crime." This court agrees with the rationale of Rodriguez v. United States Parole Com'n, 594 F.2d 170, 173 (1979) to the effect that:
 The first part of this inquiry, whether the regulation involved here is equivalent to a "statute" for purposes of the clause, need not detain us long. When Congress has delegated to an agency the authority to make a rule instead of making the rule itself, the resulting administrative rule is an extension of the statute for the purposes of the clause.
This court therefore holds that the regulation in question is the equivalent of a "statute" for the purpose of determining whether the regulation violates the ex post facto clause. CT Page 6309
This court also rules for the same reason that it ruled that Public Act 89-383 section 13 does not violate the ex post facto clause that the regulation in question also does not violate the ex post facto clause.
ORDER
The petition for writ of habeus corpus is therefore ordered dismissed.
AXELROD, J.